## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

RODERICK HOWARD                                   Case No. 1:10-cv-547
    Plaintiff                                 Dlott, J.
                                              Litkovitz, M.J.

    vs

COMMISSIONER OF                                   **REPORT AND**
SOCIAL SECURITY,                                  **RECOMMENDATION**
    Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 9), the Commissioner's response in

opposition (Doc. 12), and plaintiff's reply memorandum (Doc. 16).

### PROCEDURAL BACKGROUND

Plaintiff was born in 1956 and was 52 years old at the time of the administrative law

judge's (ALJ) decision. Plaintiff has a high school education and past relevant work experience

as a chemical operator.

Plaintiff filed applications for DIB and SSI on April 13, 2006, alleging disability since

April 30, 2004, due to back, spine and shoulder problems, depression, anxiety and panic issues.

(Tr. 121-26, 127-30; 140). Plaintiff's applications were denied initially and upon

reconsideration. (Tr. 83-99). Plaintiff requested and was granted a de novo hearing before an

ALJ. (Tr. 102-07). On January 28, 2009, plaintiff, who was represented by counsel, appeared

and testified at a hearing before ALJ Robert W. Flynn. (Tr. 24-74). A vocational expert (VE), Robert E. Breslin also appeared and testified at the hearing. (Tr. 74-81).

On April 2, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications. The ALJ determined that plaintiff suffers from the severe impairments of degenerative disc disease, left shoulder impingement syndrome, degenerative joint disease of the right knee with a meniscal tear, bilateral carpal tunnel syndrome, residuals of a right elbow tendon tear, bilateral hip pain, depression, and post-traumatic stress disorder. (Tr. 12). The ALJ found that plaintiff's impairments do not alone or in combination meet or equal the level of severity described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform a range of work at the light level of exertion. (Tr. 16). The ALJ determined that plaintiff's subjective allegations of disability are less than credible. (Tr. 15). The ALJ next determined that plaintiff is unable to perform any past relevant work. (Tr. 17). However, based on the VE's testimony, the ALJ determined that plaintiff is capable of performing a significant number of jobs in the national economy including jobs as an unskilled assembler. (Tr. 17-18). Consequently, the ALJ concluded that plaintiff is not disabled under the Act. (Tr. 18).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner. (Tr. 1-5).

2

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g). The Court's sole function is to determine whether the record as a whole contains

substantial evidence to support the Commissioner's decision. The Commissioner's findings

stand if they are supported by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court must consider the

record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age

65, file an application for such benefits, and be under a disability as defined by the Social

Security Act. 42 U.S.C. §§ 416(1), 423. Establishment of a disability is contingent upon two

findings. First, plaintiff must suffer from a medically determinable physical or mental

impairment that can be expected to result in death or that has lasted or can be expected to last for

a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the

impairments must render plaintiff unable to engage in the work previously performed or in any

other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible

individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is

dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To

establish disability, plaintiff must demonstrate a medically determinable physical or mental

3

impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a) and § 416.920(a). First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted). Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d) and § 416.920(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward

4

with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a) and §416.925. If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d) and § 416.920(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981).

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson* v. *Commissioner of Social Security,* 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born* v. *Secretary of Health and Human Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiffs age, education, and background, as well as the job requirements. *Wilson,* 378 F.3d at 548. *See also Richardson* v. *Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut

5

plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson,* 378 F.3d at 548.

A mental impairment may constitute a disability within the meaning of the Act. *See 42* U.S.C. §§ 423(d)(l)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 416.920a. The special procedure also applies when Part A of the Listing is used for an individual under age 18. *Id.* At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers* v. *Commissioner Social Sec. Admin.,* 582 F.3d 647,653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(l)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft* v. *Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered

6

severe and the claimant is conclusively not disabled. *Id.* (citing § 404.1520a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing § 404.1520a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant whose impairment meets the requirements of the Listing will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters* v. *Comm'r of Soc. Sec.,* 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris* v. *Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404. 1527(d)(2); *see also Blakley* v. *Commissioner,*

7

581 F.3d 399, 406 (6th Cir. 2009); *Wilson* v. *Commissioner,* 378 F.3d 541, 544 (6th Cir. 2004).

"The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527( d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.l527(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of

9

disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL RECORD

Plaintiff treated with primary care physician, Dennis J. Ward, D.O., from June 2, 2002 to August 26, 2008. (Tr. 423-56). Dr. Ward treated plaintiff primarily for insomnia, hyperlipidemia, and anxiety. *Id.* Follow-up treatment records show that plaintiff's depression and anxiety were fairly well controlled with medications. Dr. Ward also referred plaintiff for a sleep study due to his complaints of insomnia. *Id.*

Plaintiff saw Suresh Nayak, M.D., for left shoulder pain on August 17, 2004, after he fell down some stairs. (Tr. 420-22). Examination revealed "pretty good" neck movements, reduced triceps reflexes and good grip with no evidence of hand weakness. (Tr. 420). Dr. Nayak found left rotator cuff problems and bilateral carpal tunnel syndrome. Left shoulder x-rays showed mild arthritic changes of the AC (acromioclavicular) joint. (Tr. 421).

In October 2004, plaintiff underwent decompression and repair of a lesion of the left shoulder and left carpal tunnel release performed by one of Dr. Nayak's partners, George Shybut, M.D. (Tr. 347-48). Following surgery, plaintiff followed up with Dr. Shybut, who noted ongoing loss of range of motion and strength. (Tr. 414-19). Plaintiff underwent physical therapy and steroid injections. *Id.*

On January 19, 2005, plaintiff consulted with psychiatrist, Irfan Dahar, M.D. Plaintiff reported that he had an incident at work in which he was threatened. Dr. Dahar noted that plaintiff exhibited a depressed mood and a sad, nervous and anxious affect. His thoughts were slow but goal-directed, he had no suicidal ideations or psychotic symptoms, he was oriented, and

10

his short term memory was intact.  Plaintiff had fair insight and judgment.  Dr. Dahar diagnosed plaintiff with major depressive disorder and post-traumatic stress disorder and assigned him a Global Assessment of Functioning (GAF) score of 50.[2]  Dr. Dahar prescribed Paxil and Abilify and referred plaintiff for mental health counseling.  (Tr. 354-55).

The record contains therapy notes from psychotherapist, John K. Scudder, LPCC, dated from January 20, 2005 to January 20, 2006.  (Tr. 251-57).  In January 2005, plaintiff reported that he was depressed over the breakup of his marriage, he was having difficulty sleeping, and was suffering from mood swings.  (Tr. 256-57).  In February 2005, plaintiff was "tearful over his work/domestic situation."  (Tr. 255).  In January 2006, plaintiff reported having difficulty falling asleep as his mind kept racing.  (Tr. 251).

On February 23, 2005, plaintiff reported to Dr. Dahar that he stopped taking Abilify because he was unable to breathe.  Plaintiff stated he was nervous and anxious, but he had no suicidal ideations or psychotic symptoms.  Dr. Dahar noted that plaintiff did fairly well in therapy.  (Tr. 353).

James Plunkett, M.D., a spine cord injury specialist, evaluated plaintiff in early 2005. (Tr. 240-50).  Examination revealed an antalgic gait; right extremity muscle strength was normal except for a slight reduction in the right thumb and grip, which was ankylosed at the joint; and left extremity strength was normal except for a slight reduction in the deltoid.  (Tr. 244, 248).

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).  The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."  *Id.*  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 34.  The DSM-IV categorizes individuals with a score of 50 as having "severe symptoms ... or serious impairment in social, occupational, or school functioning."  *Id.*

Cervical and lumbar motion was reduced, bilateral straight leg raising was normal, reflexes were intact, and sensation was reduced in the left fingertips. Dr. Plunkett ordered MRI testing.

An MRI of the lumbar spine taken on February 24, 2005, showed scoliosis with multilevel degenerative disc disease and spondylitic change. There were degenerative changes of the facet joints, and no high-grade stenosis or disc protrusion or bulge. (Tr. 238-39). A February 28, 2005, MRI of the cervical spine revealed a mixed disc-osteophyte complex abutting the cervical portion of the cord, and some neural foraminal compromise. (Tr. 235-36). A thoracic spine MRI taken that same day revealed multilevel spondylitic changes and a disc protrusion impinging upon the right side of the cord to a mild degree at T7-T8. (Tr. 237).

On March 17, 2005, Dr. Plunkett reported plaintiff's MRI results to Dr. Shybut and concluded that there was a limited likelihood that plaintiff could return to his prior employment, and might be eligible for Social Security based on a short-term prognosis. (Tr. 241).

On April 19, 2005, plaintiff underwent left shoulder arthroscopic debridement and resection. (Tr. 412-13).

Plaintiff presented to the emergency room on May 12, 2005, with complaints of left shoulder pain following an altercation. (Tr. 341-44). Plaintiff's mood and affect were noted to be normal. (Tr. 342). Examination revealed a gait within acceptable limits, reflexes were intact, and left shoulder motion was reduced. *Id.* Left shoulder x-rays were negative. (Tr. 343).

Plaintiff underwent a left shoulder MRI on May 21, 2005, which showed disruption of the inferior aspect of the capsule of the acromioclavicular joint, and mild tendinosis of the distal tendons. (Tr. 406).

12

Consulting pain specialist, Sairam Atluri, MD, saw plaintiff on October 25, 2005, with neck and back pain radiating into the legs. (Tr. 267-68). Plaintiff was oriented, and he had no depression, anxiety or agitation. Lumbar flexion and extension were good, straight leg raising was normal, strength in the lower extremities was normal, and there were no sensory deficits in the lower extremities. Dr. Atluri recommended epidural steroid injections, muscle stimulation and muscle relaxants. (Tr. 268). On January 20, 2006, Dr. Atluri found that the first epidural injection helped but the second one did not. Most of plaintiff's pain was located on the right side of the back. Plaintiff reported it went up to the right thoracic region and to the buttock and right groin. Plaintiff was oriented, and did not appear to be depressed, anxious, agitated, or in severe pain. Dr. Atluri scheduled facet injections and doubted that there are any surgical options because the MRI had no major changes. Regarding muscle stimulation, Dr. Atluri noted that plaintiff was allergic to the pads and that the Lidoderm patch did not help. (Tr. 260-61). On March 27, 2006, plaintiff had weakness and tingling in the lower extremities. Dr. Atluri reported that plaintiff has failed interventional therapies and he was not comfortable offering him median branch blocks or radiofrequency. Physical therapy did not help. Dr. Atluri sent plaintiff for surgical options and concluded, "I have nothing to offer him because muscle stimulation and Lidoderm patch did not help, and he is high risk for opioids. He is not too keen on psychological modalities." (Tr. 259).

On December 14, 2005, plaintiff reported to Dr. Dahar that he was experiencing severe symptoms of anxiety. He felt nervous, anxious and agitated. He reported he had been experiencing panic attacks 2-3 times per day. No suicidal/homicidal ideas, intents or plans were reported. No psychotic symptoms were reported. Dr. Dahar engaged plaintiff in individual

13

therapy focused on improving quality of life, coping skills, and symptom management. (Tr. 352).

On March 8, 2006, plaintiff complained of depression and Dr. Dahar increased plaintiff's Paxil

dosage. (Tr. 351).

A May 15, 2006, body bone scan showed degenerative change in the AC joint bilaterally

and arthritic changes in the hips, knees and ankles. (Tr. 337).

A May 25, 2006 MRI of the lumbar spine revealed: degenerative disc disease at L4-5

with a bulging disc, that was broad-based, eccentrically more prominent leftward; facet

arthropathy, with the findings resulting in bilateral foraminal stenosis, left greater than right; and

moderate to moderately severe central canal stenosis. There was a broad-based bulging disc at

L3-4 and facet arthropathic changes resulting in bilateral foraminal stenosis, right greater than

left. Centrally, the bulging disc effaced the ventral thecal sac and along with ligamentum flavum

hypertrophy, resulting in mild central canal stenosis. (Tr. 404-05).

Plaintiff consulted with spinal surgeon, Anthony Guanciale, M.D., in June 2006. (Tr.

285-303). Examination showed reduced left lumbar flexion and extension, no neurological

deficits, and no atrophy. (Tr. 297-98). Dr. Guanciale ordered a discogram that was positive at

L2-L3, L3-L4 and L4-L5. It was read as being mostly positive at L4-L5, with moderate to

marked spinal stenosis and foraminal stenosis at that level. There was also evidence of mild to

moderate spinal stenosis at L3-L4. (Tr. 283-84).

A non-examining state agency medical consultant, Dr. Willa Caldwell, M.D., completed

an RFC assessment on July 11, 2006. (Tr. 360-367). Dr. Caldwell found plaintiff capable of

performing medium work in that plaintiff could occasionally lift 50 pounds and frequently lift 25

pounds; he could stand and/or walk about 6 hours in an 8-hour workday; he could sit about 6

hours in an 8-hour workday; his ability to push and/or pull was unlimited; and he could climb ramps/stairs, balance, kneel, crouch and crawl frequently, stoop occasionally and could never climb ladders, ropes, or scaffolds. (Tr. 361-362). Dr. Caldwell also found that plaintiff should be limited in reaching overhead with his left arm due to his history of shoulder pain. (Tr. 363). Dr. Caldwell summarized the objective evidence on which her findings were based as follows:

> MRI's of C/S, T/S and L/S 2/05 showed mixed disc-osteophyte complex abutting the cervical portion of the cord, disc protrusion impinging upon the right side of the cord to a mild degree at T7 and scoliosis with multilevel disc disease and spondylotic change. Degenerative changes of the facet joints. 1/06 exam showed clmt with back pain. Clmt not in severe pain. PE of 3/05 showed 5/5 strenght (sic) in all extremities. No atrophy. Negative SLRs bilat. DTRs 2+ 3/06 exam showed tender paralumber musculature and spasm. 5/5 strength all extremities. No sensory deficits.

(Tr. 361).

Dr. Guanciale reported on August 1, 2006, that plaintiff ambulated independently with a slow gait. He showed marked restriction of lumbar range of motion with complaints of severe debilitating back pain. He had a positive straight leg raise complaining of severe back pain. He displayed give-way weakness of the lower extremities with complaints of severe back pain. He had give-way weakness of the lower extremities to resistive testing. He had some sensory alteration. Dr. Guanciale reported the following findings: 1) Radiographic evaluation to date including bone scan and MRI showing evidence of moderate lumbar spondylosis L4-5 level, and mild to moderate spondylosis L3-4 level with central disc herniation; 2) mild to moderate spondylosis LS-S1 level; 3) mild to moderate thoracolumbar spondylosis; 4) chronic low back pain, mechanical in nature, and complaints of chronic pain; 5) complaints of bilateral hip pain, and bilateral testicular pain of unclear etiology; 6) mild left leg length discrepancy, and mild pelvic obliquity; 7) mild degenerative lumbar scoliosis and thoracolumbar scoliosis possibly

15

associated with leg length discrepancy; 8) complaints of chronic neck pain; 9) complaints of chronic thoracic pain; 10) mild to moderate thoracolumbar spondylosis; 11) mild to moderate lumbar spondylosis greatest at the L3-4 and L4-5 levels without evidence of focal significant compressive pathology; 12) positive Waddell's sign on physical examination; 13) chronic bilateral knee pain with reported ACL injuries; and 14) chronic pain syndrome, pain complaints, and requests for narcotics. He reported that plaintiff stated he was utilizing up to 10 Vicodin per day. (Tr. 280). Dr. Guanciale noted that plaintiff may benefit from a further work up by undergoing a lumbar CT discography at the L2-3, L3-4 and L4-5 levels. Dr. Guanciale advised plaintiff that depending on test results he might be able to partially benefit from a lumbar operative stabilization procedure at the L3-4 and L4-5 levels. Dr. Guanciale concluded "that there may be no one treatment that will allow him to get back to a physical occupation such as he has been employed at over his adult life." (Tr. 280-81).

On August 16, 2006, plaintiff complained of depression and panic attacks. Dr. Dahar reported that plaintiff was experiencing severe symptoms of depression, anxiety and panic. He discontinued Paxil, began prescribing Effexor, and continued plaintiff on Valium. (Tr. 350).

A September 19, 2006, a CT discogram ordered by Dr. Atluri revealed mild to moderate stenosis at L3-4 and moderate to marked central stenosis at L4-5 with foraminal stenosis. (Tr. 323-24).

On September 20, 2006, plaintiff complained that he was experiencing side effects from his medication. Dr. Dahar decreased the dosage of Effexor. (Tr. 349).

16

On February 6, 2007, state agency physician Dr. Dimitri Teague, M.D., reviewed the evidence of record and affirmed Dr. Caldwell's RFC assessment that plaintiff was capable of performing medium work. (Tr. 359).

An April 30, 2007, cervical spine x-rays showed kyphosis, spur formation from C2 to C5, and disc thinning from C4 to C6. (Tr. 462).

Plaintiff presented to Eastside Urgent Care on March 19, 2008, complaining of right knee pain after he fell two days previously. An examination showed symmetric reflexes, normal sensation, normal strength, and right knee findings consistent with mild to moderate strain/sprain. A psychiatric examination was normal with normal interaction, and appropriate affect and demeanor. (Tr. 400-02).

Plaintiff followed up with Dr. Shybut for treatment of his knee. (Tr. 411). An April 8, 2008 MRI of the right knee ordered by Dr. Shybut showed ACL (anterior cruciate ligament) reconstruction with suspected graft failure, an ACL mechanism failure, a medial meniscus tear, and a lesion, effusion, and capsulitis. (Tr. 403).

When seen by Dr. Shybut on April 18, 2008, plaintiff reported that he was doing reasonably well in his brace. Plaintiff's main problem was pain and swelling. Dr. Shybut noted that plaintiff was pending approval for Medicare benefits. Once benefits were obtained, Dr. Shybut planned on proceeding with revision ACL surgery. Dr. Shybut gave plaintiff a local corticosteroid injection. (Tr. 410).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that he lives alone. (Tr. 24). He has a driver's license and drives "some; not much." (Tr. 25). He drives for short periods, about 5-10

17

minutes. He drove himself to the hearing, a distance of about 30 miles. *Id.* Plaintiff testified that he did not have a high school education and has not received a GED. *Id.* He left school and went to work in a foundry to help his mother at the age of 16. (Tr. 25, 63).

He stopped working in April 2004, due to depression and panic attacks. (Tr. 27, 47). He could not work because he could not deal with the situation, and he could not deal with people. (Tr. 50). He testified that his physical problems include back and leg problems, problems standing for too long, and that his legs have given out, resulting in some falls. (Tr. 28). He has impairments of the elbow, thumb, and knees from an accident. *Id.* He tore the ACL in his right knee. *Id.* His knee locks up, that he has no stability in the knee without a brace. He has a tear in the right shoulder. (Tr. 29). He has a fused disc in his neck. *Id.* He has had injections in the neck. *Id.* He has herniations and bulging discs at multiple levels of his lumbar and cervical spine. *Id.* He has carpal tunnel syndrome in both hands. (Tr. 30). The right one has had surgery, but he did not have surgery on the left because he testified that the surgery on the right was unsuccessful. *Id.* He further testified that he continues to experience depression, anxiety, panic attacks, and insomnia. *Id.* He takes medications for his mental problems, as well as Vicodin for pain and a muscle relaxant. (Tr. 33). He denied side effects from his medications. (Tr. 34). He later stated that he stopped his taking medications due to the lack of insurance and because the clinic went out of business. (Tr. 46). He only sleeps for about two hours of broken up sleep. (Tr. 51). He experiences racing thoughts, "It's almost like a videotape." (Tr. 52).

Plaintiff also testified to his historical medical problems which included right leg surgery, two surgeries in the knees, a thumb fixation and fusion, a right elbow tendon tear, two rotator

18

cuff surgeries, facial reconstruction surgery, a torn retina, three meniscectomies, and an abdominal hernia. (Tr. 31-33).

He wears a brace on his right knee. (Tr. 34). Plaintiff testified that he cannot lift more than a half gallon of milk. (Tr. 35). He can sit only fifteen minutes and stand and/or walk five to ten minutes. *Id.* He has problems reaching overhead with both arms. His right thumb does not work well and he drops items. (Tr. 35-36). He has trouble concentrating and paying attention. (Tr. 36). He has problems keeping appointments and paying bills on time. (Tr. 37).

He has a few friends with whom he gets along. (Tr. 38, 43). One works at Kroger's and brings him groceries. *Id.* He can shower independently and microwave meals. *Id.* He needs help to put on his clothes and shoes. (Tr. 39). He does not do much housework. He mother and brother help out. (*Id.*, Tr. 67). He takes out the trash and occasionally does his own laundry. *Id.* Otherwise, his mother does it. He tries to get someone to drive him places. (Tr. 40). He watches television and reads. (Tr. 40-42).

He used to enjoy various hobbies. (Tr. 42, 65-66). He participated in woodworking, cycling, and rock climbing, and he belonged to a gym. *Id.* He played volleyball, soft ball, tennis and racquet ball. He enjoyed hunting. (Tr. 66).

His prior job consisted of lifting, bending, twisting and pulling up to 2,000 pounds for 18 years. He had 2,000-pound supersacks which he would move with a hoist, and then, lift with a chain hoist. Sometimes he had to do it manually. (Tr. 56). He also did a lot of shoveling. Most of his job was physical, but there was "[a] lot of mental, but it was physical, because we had so many things going on at one time." (Tr. 57). He has no doubt in his mind that the carpal tunnel,

19

disc problems in his back, rotator cuff problems, and elbow problem comes from his prior job in the chemical plant. *Id.*

**OPINION**

Plaintiff assigns three errors in this case. First, plaintiff contends the ALJ failed to accord the appropriate evidentiary weight to the opinions of his treating physicians and inappropriately rejected their opinions. Second, plaintiff asserts the ALJ erred in his analysis of plaintiff's testimony, finding it was not credible. Third, plaintiff argues the ALJ's RFC assessment and hypothetical question to the VE did not accurately portray his impairments. For the reasons that follow, the Court finds the decision of the ALJ is not supported by substantial evidence and should be reversed and remanded for further proceedings.

## I. The ALJ improperly evaluated the opinions of plaintiff's treating mental health sources.

Plaintiff contends that the ALJ failed to comprehensively set forth his reasons for assigning little or no weight to the opinions of Dr. Dahar and Mr. Scudder, plaintiff's long-standing treating mental health specialists.

The record contains treatment notes from Dr. Dahar from January 2005 through September 2006. (Tr. 349-355). In a mental status examination in January 2005, Dr. Dahar reported that plaintiff's mood was depressed; his affect was sad, nervous and anxious; his thoughts were slow, but goal directed; his speech was decreased in rate and volume; and his insight and judgment were fair. (Tr. 354). Dr. Dahar diagnosed major depressive disorder and post-traumatic stress disorder and assigned plaintiff a Global Assessment of Functioning (GAF) score of 50. Dr. Dahar's treatment notes from February 2005 through September 2006 report that plaintiff experienced severe symptoms of depression, anxiety and panic. (Tr. 349-353).

20

The ALJ gave "some weight" to Dr. Dahar's treatment notes, but found that Dr. Dahar's GAF score of 50 was not well supported and was inconsistent with other evidence. (Tr. 16). In this regard, the ALJ indicated that Dr. Atluri noted that plaintiff did not appear anxious, agitated or depressed in October 2005 and in January 2006. (Tr. 16). The ALJ further noted in October 2005 plaintiff denied any depression or anxiety, and in March 2008 an emergency room physician noted that plaintiff exhibited an appropriate affect and demeanor. *Id.* The ALJ also noted that Dr. Dahar's treatment notes relied heavily on plaintiff's self-reported complaints. *Id.*

Although the ALJ outlined several reasons for affording "some weight" to Dr. Dahar's treatment notes, the majority of the reasons the ALJ gave for discounting Dr. Dahar's opinion are not supported by the record, and therefore do not constitute "good reasons" as required by agency regulations and controlling law. Notably, treating physician opinions that are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other record evidence are entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(2). Yet, even where the ALJ declines to give controlling weight to a treating physician's opinion, Social Security Ruling 96-2p dictates that the opinion is nonetheless entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' *not that the opinion should be rejected.* Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. *In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.*

SSR 96-2p (emphasis added). *See also Blakley,* 581 F.3d at 408 (even where treating physician not afforded controlling weight by ALJ, that does not mean treater's opinion should be rejected).

21

As explained by the Sixth Circuit in *Wilson,* "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (discussing 20 C.F. R. § 404.1527(d)(2)). The ALJ must satisfy the clear procedural requirement of giving "good reasons" for the weight accorded to a treating physician's opinion: "[A] decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' Social Security Ruling 96-2p, 1996 WL 374188, at *5 (1996)." *Wilson*, 378 F.3d at 544. The specific reasons requirement exists not only to enable claimants to understand the disposition of their cases, but to ensure "that the ALJ applies the treating physician rule and permit[] meaningful review of the ALJ's application of the rule." *Id.* Only where a treating doctor's opinion "is so patently deficient that the Commissioner could not possibly credit it" will the ALJ's failure to observe the requirements for assessing weight to a treating physician not warrant a reversal. *Id.* at 547.

In this case, the ALJ gave only some weight to Dr. Dahar's treatment notes because Dr. Dahar purportedly "relied heavily on [plaintiff's] self-reported complaints." (Tr. 16). Without any elaboration or detail, the ALJ's conclusion in this regard fails to satisfy the procedural requirements for rejecting a treating physician's opinion set forth in § 404.1527(d)(2) and by

22

*Wilson*, 378 F.3d at 546. Moreover, the ALJ's conclusion is illogical "since psychology and psychiatry are, by definition, dependent on subjective presentations by the patient. Taken to its logical extreme, the ALJ's rationale for rejecting [the treating psychiatrist's] conclusions would justify the rejection of opinions by all mental health professionals, in every case." *Winning v. Commissioner of Social Sec.,* 661 F. Supp.2d 807, 821 (N.D. Ohio 2009). The ALJ's conclusion that Dr. Dahar'S GAF score of 50 is not well supported and inconsistent with other evidence ignores Dr. Dahar's objective and clinical findings[3] as well as those of the other examining sources of record. These include findings such as decreased speech (Tr. 354); anxious or nervous mood (Tr. 349, 350, 352, 353); sad, nervous, and anxious affect (Tr. 354); depressed or sad mood (Tr. 350, 351, 353, 354); panic attacks (Tr. 349, 350, 352, 353); agitation (Tr. 350, 352, 353, 354); racing thoughts (Tr. 350); withdrawal from activities (Tr. 351); fatigue and lack of motivation (Tr. 351); and insomnia (Tr. 350, 352).

The ALJ also erroneously found that Dr. Dahar's findings were inconsistent with other evidence. The ALJ cited to Dr. Atluri's treatment notes from October 2005 and January 2006 wherein he noted that plaintiff did not appear to be depressed, anxious or agitated. (Tr. 261, 268). However, Dr. Atluri is pain specialist who treated plaintiff for neck and back pain, not his psychological impairments. Unlike Dr. Dahar, Dr. Atluri is not a psychiatrist and his findings

---

[3]Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. § 404.1528(b) and (c). *See* 20 C.F.R. § 404.1512(b)(1). "Signs" are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.,* abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).

relating to plaintiff's mental impairments do not provide sufficient evidence to discount the findings of the treating psychiatrist, Dr. Dahar.

The ALJ also found that Dr. Dahar's findings were inconsistent with treatment notes from plaintiff's therapist, Mr. Scudder, which "mainly show problems related to divorce, loss of his job, and insomnia." (Tr. 16). Such a finding clearly indicates that the ALJ inserted his own non-medical opinion as to what defines depression, and what stressors appropriately cause depression. This was clear error. The undersigned does not dispute that it is the ALJ's prerogative to resolve conflicts and weigh the evidence of record. However, it appears in making this determination, the ALJ, in part, impermissibly substituted his own medical judgment for that of the treating mental health sources. *See Bledsoe v. Commissioner of Social Sec.,* No. 1:09-cv-564, 2011 WL 549861, at *7 (S.D. Ohio Feb. 8, 2011) (Barrett, J.) (ALJ not permitted to substitute own medical judgment for that of treating physician or to make own independent medical findings) (and cases cited therein). While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, he is not permitted to make his own evaluations of the medical findings. *Id. See also Simpson v. Commissioner of Social Sec.,* 344 F. App'x 181, 194 (6th Cir. 2009) (citing with approval *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings")).

Based on the foregoing, the undersigned finds that the ALJ's reasons for declining to give controlling weight to Dr. Dahar's findings are not supported by the evidence of record. *Wilson,* 378 F.3d at 544. In the absence of "good reasons" for the ALJ's decision to give only "some"

weight to the treating psychiatrist's opinions as required by agency regulations and controlling case authority, this matter should be remanded for further proceedings.

To the extent plaintiff contends the ALJ erred by giving little or no weight to the opinions of "Dr. Scudder" (Doc. 9 at 13), the ALJ was not required to give any special weight to plaintiff's treating mental health therapist because Mr. Scudder is not a physician or psychologist, but rather a licensed professional clinical counselor who is not an acceptable medical source[3] within the definition set forth by the regulations. *See* 20 C.F.R. § 404.1513(a). Rather, he falls into the category of "other sources." 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)). *See Stigall v. Astrue*, No. 6:10-cv-27, 2011 WL 65886, at *5 (E.D. Ky. Jan. 10, 2011) (licensed professional counselors are not listed as "acceptable medical sources," but rather "other" sources); *Redden v. Comm'r of Soc. Sec.,* No. 1:09-330, 2010 WL 3522338, at *8 (S.D. Ohio Mar. 30, 2010) (holding that counselors and social workers are "other" non-medical sources, not "acceptable medical sources"). Therefore, the ALJ did not err by failing to give controlling weight to Mr. Scudder's findings.

Nonetheless, there is no indication from the ALJ's decision that he properly considered Mr. Scudder's treatment notes in accordance with agency regulations. Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* Factors to be considered in evaluating opinions from "other

---

[3] SSR 06-03p provides that the Commissioner will consider all available evidence in an individual's case record, including evidence from medical sources. The term "medical sources" refers to both "acceptable medical sources" and health care providers who are not "acceptable medical sources." *Id.* (citing 20 C.F.R. § 404.1502 and § 416.902). Licensed physicians and licensed or certified psychologists are "acceptable medical sources." *Id.* (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)).

sources" who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. *Id.* *See also Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Accordingly, on remand the ALJ should be instructed to properly consider and evaluate Mr. Scudder's treatment notes in accordance with agency regulations and controlling law.[4]

### II. The ALJ did not err in assessing plaintiff's credibility.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers,* 486 F.3d at 247 (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton,* 246 F.3d at 773. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst*, 753 F.2d at 519. In this regard, Social Security Ruling 96-7p explains:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the

---

[4]Plaintiff also asserts the ALJ placed little or no weight on the opinions of his other treating physicians, Drs. Guanciale, Shybut, Plunkett, Nayak, Atluri and Ward, in assessing plaintiff's RFC and developing various hypotheticals submitted to the vocational expert. The Court addresses this error in Section III below.

> case record.  An individual's statements about the intensity and
> persistence of pain or other symptoms or about the effect the symptoms
> have on his or her ability to work may not be disregarded solely because
> they are not substantiated by objective medical evidence.

SSR 96-7p.

In addition, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*.  The ALJ's credibility decision must also include consideration of the following factors:  1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

Plaintiff appears to argue that the ALJ's credibility analysis is flawed as follows: (1) the ALJ erred in finding that he was less than fully credible because the his testimony is consistent with the objective medical evidence; (2) the ALJ improperly considered plaintiff's activities; and (3) improperly considered plaintiff's participation in a physical altercation that required police intervention.

27

The ALJ's decision sets forth in detail the reasons for his credibility finding and those reasons are substantially supported by the record evidence. The ALJ cited to numerous factors in assessing plaintiff's credibility, including notations from his treating pain management specialist about observations of plaintiff's pain level (Tr. 261, 268); normal findings on physical examination (Tr. 268)[5]; physical examination findings of giveaway weakness and positive Waddell signs for inorganic pain (Tr. 280); recommendations for certain treatment modalities without evidence of follow-up by plaintiff (Tr. 357–for nerve block; Tr. 416–physical therapy); a gap in medical treatment from September 2006 to March 2008 except for chiropractic treatment from April 2007 and June 2007; inconsistent statements about plaintiff's education level; inconsistent allegations regarding the reason for being off work (Tr. 429); and the ability to get into a physical fight. (Tr. 341).

Although plaintiff has presented plausible, alternative explanations for several of the reasons cited by the ALJ[6], even if substantial evidence would support the opposite conclusion the Court must uphold the ALJ's credibility decision where, as here, it is supported by substantial evidence. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). The ALJ's decision reflects that he properly considered the required factors in determining plaintiff's credibility and reasonably

---

[5]The report reflects findings of no tenderness in the spinous processes, paraspinal muscles, facets, or SI joints bilaterally. There was good range of motion of the lumbar spine on flexion and extension. Straight leg raise and crossed straight leg raise tests were negative bilaterally. The lower extremities had normal motor strength. There were no sensory deficits appreciated in the lower extremities, and neither leg had weakness with dorsiflexion or plantar flexion. Plaintiff's gait was normal. (Tr. 268).

[6]For example, while the ALJ noted plaintiff's testimony that he had a ninth grade education with no GED conflicted with his application for disability benefits indicating he had a high school education, plaintiff explained at the hearing that he dropped out of school to get a job to help his family. (Tr. 25). Plaintiff also points out that the "fight" referenced by the ALJ was actually a domestic dispute between plaintiff and his ex-wife where he was pushed and felt something tear in his left shoulder. (Tr. 44, 341; Doc. 9 at 17).

concluded that plaintiff was not credible. *See* 20 C.F.R. § 416.929(c). In light of the ALJ's opportunity to observe plaintiff's demeanor, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Kirk,* 667 F.2d at 538. *See also Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997); *Gaffney v. Bowen*, 825 F.2d 98, 101 (6th Cir. 1987). Accordingly, the Court finds substantial evidence supports the ALJ's credibility finding in this matter.

**III.  The ALJ's RFC finding is without substantial support in the record.**

Plaintiff's third assignment of error asserts that the ALJ failed to consider the effect of all of plaintiff's impairments in evaluating his ability to perform other work. As a result, plaintiff contends that the ALJ's RFC assessment and hypothetical question to the VE did not accurately portray his impairments and therefore are not supported by substantial evidence.

The ALJ determined that plaintiff has an RFC for a limited range of light work: he can lift and carry up to 20 pounds occasionally and 10 pounds frequently; he can stand and/or walk for six hours in an eight-hour work day and sit for two hours in an eight-hour workday; he can occasionally operate right foot controls, climb ramps and stairs, balance, stoop, crouch, crawl, reach overhead with the left arm, and finger with the right hand; and he should avoid unprotected heights, moving machinery and moderate exposure to wetness and humidity. The ALJ also limited plaintiff to simple, routine, and repetitive tasks in a low-stress environment defined as free of fast paced production requirements. The work should involve only simple, work-related decisions, few work place changes, and only occasional superficial contact with the public and co-workers. *Id.* Plaintiff asserts the ALJ's RFC finding is not supported by substantial evidence. The Court agrees.

29

In this case, the only physicians of record to opine on plaintiff's physical functional limitations were Dr. Caldwell and Dr. Teague, the non-examining state agency physicians who reviewed the record in July 2006 and February 2007, respectively. The reviewing physicians opined that plaintiff is capable of performing medium work with occasional stooping, frequent overhead work with the left upper extremity, and no climbing of ladders, ropes or scaffold. (Tr. 16, 359, 361-363). The ALJ gave only "some weight" to the findings of the state agency physicians, noting that additional information had been obtained (purportedly since the state agency RFC assessments) and citing the March 2005 treatment notes from Dr. Plunkett which indicated "a limited likelihood that the claimant would be able to return to his past work as a chemical operator." (Tr. 16).[7] The ALJ found Dr. Plunkett's opinion, "albeit conclusory, is supported by the medical evidence as a whole and deserves 'some weight.'" (Tr. 16). The ALJ then concluded that plaintiff was capable of performing a range of light work. Although the ALJ's RFC finding is more limiting than that of the state agency physicians, the Court nevertheless concludes that the ALJ's RFC finding is not supported by substantial evidence.

The Court is unable to discern from the ALJ's opinion how he arrived at the RFC decision and what evidence the ALJ relied upon in making that decision. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." Social Security Ruling 96-8p (1996). Here, the ALJ failed to articulate the basis

---

[7] This finding is somewhat puzzling as Dr. Caldwell completed his RFC assessment in July 2006, a year after Dr. Plunkett's statement relating to plaintiff inability to return to his past work.

30

for his RFC opinion and to link his RFC determination with specific evidence in the record in accordance with Social Security Ruling 96-8p.

The record is devoid of any other physician opinions on plaintiff's physical functional capacity or limitations. Notably, there are no RFC assessments from plaintiff's treating physicians in this matter. Plaintiff's diagnoses of lumbar disc disease, degenerative joint disease of the knee, shoulder impingement, and carpal tunnel syndrome do not translate automatically into clearly definable exertional restrictions, much less denote an ability to perform a range of light work activity. Significantly, the ALJ's decision fails to include a narrative explanation describing how the medical evidence of record supports the specific exertional limitations set forth in the ALJ's RFC finding. *See* SSR 96-8p. While the ALJ states he gave "some weight" to both the state agency reviewers' RFC for medium work and to Dr. Plunkett's finding that it is unlikely plaintiff could return to his previous employment (Tr. 16), there is no indication from the ALJ's decision that he considered the other objective medical evidence, treatment notes, or medical opinions in concluding plaintiff could perform a range of light exertional work.[8]

It is the responsibility of the ALJ to formulate the RFC. *See* 20 C.F.R. § 404.1546(c). In rendering the RFC decision, it is incumbent upon the ALJ to give some indication of the specific evidence relied upon and the findings associated with the particular RFC limitations to enable this Court to perform a meaningful judicial review of that decision. Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at his RFC

---

[8]For example, the ALJ fails to discuss Dr. Shybut's assessment in April 2008 that plaintiff needs surgery on his right knee for a recurrent tear of the right ACL and that surgery was on hold because plaintiff had not yet been approved for medical insurance benefits. (Tr. 410). The ALJ's RFC assessment requires plaintiff to walk and/or stand for six hours in an eight hour workday and occasionally operate right foot controls, yet the ALJ's decision fails to acknowledge this evidence or the impact of plaintiff's knee impairment on his RFC assessment.

31

determination. Based on the current record, the Court is unable to discern the underlying basis

for the ALJ's conclusion that plaintiff retains the functional capacity to lift and carry ten pounds

frequently and twenty pounds occasionally; to sit, stand and walk for six to eight hours in an

eight-hour work day; and to occasionally operate right foot controls, climb ramps and stairs,

balance, stoop, crouch, crawl, reach overhead with the left arm, and finger with the right hand.

(Tr. 16). Once the ALJ declined to give controlling weight to the state agency reviewers'

functional capacity assessment, he was required to cite some substantial medical and other

evidence in the record to support his findings on plaintiff's ability to lift, carry, sit, stand, and

walk, and not fashion an RFC out of whole cloth. As recognized by this Court, "[t]he ALJ must

not substitute his own judgment for a doctor's conclusion without relying on other medical

evidence or authority in the record." *Mason v. Commissioner of Social Sec.,* No. 1:07-cv-51,

2008 WL 1733181, at *13 (S.D. Ohio April 14, 2008) (Beckwith, J.; Hogan, M.J.) (citing *Hall v.*

*Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir.

2000); *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3rd Cir. 1985); *Sigler v. Secretary of Health and*

*Human Servs.,* 892 F. Supp. 183, 187-88 (E.D. Mich. 1995)). For these reasons, the Court finds

the ALJ's RFC determination is not supported by substantial evidence.

Additionally, because the ALJ's RFC assessment did not accurately portray plaintiff's

impairments, the vocational expert's testimony in response to the ALJ's hypothetical questions,

premised on such an RFC, does not provide substantial evidence that plaintiff could perform

limited light work. *White v. Commissioner of Social Sec.,* 312 F. App'x 779, 789 (6th Cir. 2009)

(ALJ erred in relying on answer to hypothetical question because it simply restated residual

functional capacity which did not accurately portray claimant's physical and mental impairments).

**IV. This matter should be reversed and remanded for further proceedings.**

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher,* 17 F.3d at 176. On remand, the ALJ should properly evaluate plaintiff's impairments in light the evidence of record, properly determine the weight to be accorded to the opinions of plaintiff's treating and examining sources, clearly articulate the rationale in support thereof, reconsider plaintiff's RFC, and provide a hypothetical question(s) to the VE that accurately portrays plaintiff's impairments.

**IT IS THEREFORE RECOMMENDED THAT:**

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/15/2011_          _Karen L. Litkovit_
                            Karen L. Litkovitz
                            United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

RODERICK HOWARD
    Plaintiff

Case No. 1:10-cv-547
Dlott, J.
Litkovitz, M.J.

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).